**COURT OF CHANCERY**
**OF THE**
**STATE OF DELAWARE**

MORGAN T. ZURN
VICE CHANCELLOR

LEONARD L. WILLIAMS JUSTICE CENTER
500 N. KING STREET, SUITE 11400
WILMINGTON, DELAWARE 19801-3734

November 18, 2019

Theodore A. Kittila, Esquire
James G. McMillan, III, Esquire
Halloran Farkas & Kittila LLP
5803 Kennett Pike, Suite C
Wilmington, DE 19807

William E. Gamgort, Esquire
Curtis J. Crowther, Esquire
Young Conaway Stargatt & Taylor, LLP
1000 North King Street
Wilmington, DE 19801

RE: *Carlos Eduardo Lorefice Lynch, et al., v. R. Angel Gonzalez Gonzalez, et al.,*
Civil Action No. 2019-0356-MTZ

Dear Counsel,

I write regarding Plaintiffs' Motion for Entry of an Order to Show Cause Concerning Defendants' Violation of Plaintiffs' Attorney-Client Privilege and Refusal to Turn Over ESI (the "Motion").[1] The parties have engaged in contentious discovery in this matter. This Motion addresses the dispute over whether work e-mails between Plaintiff Carlos Eduardo Lorefice Lynch and in-house counsel associated with Plaintiff Grupo Belleville Holdings, LLC ("Belleville" or the "Company") are confidential and subject to the attorney-client privilege.

Plaintiffs filed the Motion in July 2019, when depositions loomed in the near future. But the Motion ballooned into several rounds of briefing, the depositions were rescheduled, and the privilege issue crystallized at oral argument on October 15.[2] To give guidance on privilege in advance of those depositions, I issued a brief letter opinion granting Plaintiffs' Motion on October 18, and indicated that I would detail my reasoning in the near future.[3] Today, I provide my reasons for granting the Motion. I write for the parties and provide only the background necessary to resolve the pending dispute.

---

[1] Docket Item ("D.I.") 56 [hereinafter "Mot."].

[2] *See* D.I. 109, 146.

[3] D.I. 111.

## I.    Background

This matter was brought under 6 *Del. C.* § 18-110, and presents the question of whether Lynch properly acquired a sixty-five percent interest in Belleville in 2018.[4]  The case is expedited and set for trial in December 2019.

Belleville, a Delaware limited liability company, is a holding company for ownership interests in Argentine companies, which in turn own a variety of media assets located in Buenos Aires, Argentina.[5]  For example, Belleville owns Inversora de Medios y Comunicaciones S.A. ("IMC").[6]  IMC has seven subsidiaries, including Telearte Sociedad Anonima, Empresa de Radio y Television ("Telearte").[7]  Belleville conducts business in Florida and Argentina through a number of its subsidiaries, such as Telearte.[8]  The employees responsible for operating Belleville's subsidiary businesses work and reside in Argentina.[9]

At the time of Belleville's formation, Defendant Gonzalez owned five percent of the Company.[10]  Defendant Televideo Services, Inc. ("Televideo") owned the remaining 95 percent.[11]  Televideo is a Florida corporation with its formal principal place of business in Florida.[12]  Gonzalez controls Televideo,[13]  which is affiliated

---

[4] *See generally* D.I. 1 [hereinafter "Compl."].  Specifically, Plaintiffs seek injunctive and declaratory relief arising from Defendant Gonzalez and Defendant Televideo Services, Inc.'s efforts to strip Lynch of his ownership interest in the Company.  In the alternative, Lynch seeks damages for the value of his interest in Belleville.  *Id.* ¶ 1.

[5] *Id.* ¶ 2; D.I. 94 at 17.

[6] D.I. 56, Lynch Decl. ¶ 3 [hereinafter "Lynch Decl."].

[7] Lynch Decl. ¶ 3.

[8] *Id.*

[9] D.I. 94 at 17 & n.10.

[10] Compl. ¶ 20.  Presently, Televideo owns 30 percent of Belleville; Gonzalez owns five percent of Belleville and is the majority owner and President of Televideo.  *Id.* ¶¶ 11–12.

[11] *Id.* ¶ 20.

[12] *Id.* ¶ 12.

[13] *Id.* ¶ 11.

with other Gonzalez-controlled entities and brands operating throughout Latin America.[14]

In 2007, Belleville adopted a resolution to ensure its equity holdings in Argentine companies complied with Argentine law.[15] To implement that resolution, Belleville granted Lynch a special power of attorney and designated him as Belleville's "legal representative" in Argentina.[16] In September 2007, Lynch purchased five percent of Belleville from Televideo.[17] In January 2008, Lynch purchased an additional sixty percent of Belleville from Televideo.[18] Lynch thus became Belleville's majority holder, owning sixty-five percent of the Company.[19]

Gonzalez was Belleville's sole manager from 2006 until 2009, when Lynch became co-manager.[20] Thus, when Televideo transferred its membership interests to Lynch in 2007 and 2008, Gonzalez was the sole owner and exclusive manager of the Company.[21] Gonzalez and Lynch remained Belleville's co-managers until February 2018, when Lynch used his position as majority equity holder to execute a Limited Liability Company Agreement appointing himself as Belleville's sole manager.[22]

In addition to controlling Televideo, Gonzalez operates Albavision, a network of affiliated media companies operating throughout Latin America.[23] There is no "Albavision" entity.[24] Rather, Gonzalez either directly or indirectly owns the entities that comprise and control Albavision, such as Televideo.[25] The term Albavision is

---

[14] *See, e.g.*, D.I. 62 at 5.

[15] Compl. ¶ 21.

[16] *Id.* ¶ 22.

[17] *Id.* ¶ 23.

[18] *Id.* ¶ 26.

[19] *Id.* ¶ 28.

[20] Compl. ¶¶ 31, 51; D.I. 62 at 2.

[21] Compl. ¶¶ 23, 26–31; D.I. 62 at 3.

[22] Compl. ¶ 51.

[23] D.I. 62 at 4–5; D.I. 62, Ex. B, Gonzalez Aff. ¶¶ 4–5 [hereinafter "Gonzalez Aff."].

[24] D.I. 94 at 9; Gonzalez Aff. ¶¶ 3–4.

[25] Gonzalez Aff. ¶¶ 2–5.

widely recognized as a brand that Gonzalez owns and operates.[26] The claims in this action "only relate to Albavision assets in Argentina."[27]

The Motion addresses an email server affiliated with Albavision, which Televideo owns and Gonzalez controls. That server hosts emails with the domain "albavision.tv," which Gonzalez created for the Albavision brand. Televideo provides albavision.tv email service to several entities, including Belleville and its subsidiaries, on the albavision.tv domain for a fee.[28]

Employees of Belleville and its subsidiaries were given albavision.tv email addresses for the purpose of executing and delivering email communications pursuant to their respective job duties.[29] Televideo's server hosted those emails.[30] Employees with an albavision.tv email address, including Lynch, were aware that Gonzalez, via Televideo, owned and controlled the albavision.tv address and server.[31] Lynch is Belleville's manager and legal representative.[32] He also serves as IMC's manager, director, and President and holds senior positions with additional Belleville subsidiaries.[33] Televideo is not, and never has been, Lynch's employer.[34]

The emails at issue in the Motion are between Lynch and two attorneys employed by Belleville, named Ariel Lambert and Marcos Landaburu (collectively, "the Attorneys"). In 2009 and 2010, Belleville hired the Attorneys as counsel "for Belleville and its subsidiaries and other Latin-American companies."[35] In particular, Telearte employs the Attorneys as in-house counsel to provide legal advice to

---

[26] D.I. 62 at 5.

[27] Gonzalez Aff. ¶ 6.

[28] *See* D.I. 94 at 9; D.I. 85 at 4.

[29] D.I. 62 at 5; D.I. 62, Ex. A, Lima Aff. ¶ 5 [hereinafter "First Lima Aff."].

[30] Mot. ¶ 6; First Lima Aff. ¶ 6.

[31] First Lima Aff. ¶ 5; D.I. 85 at 5.

[32] Lynch Decl. ¶ 3.

[33] *Id.*

[34] *Id.*; D.I. 94 at 9.

[35] Gonzalez Aff. ¶ 9.

Telearte and other IMC subsidiaries.[36] The Attorneys were never formally employed by Televideo or Albavision.[37]

Lynch and the Attorneys used their albavision.tv email accounts to communicate with each other.[38] The Attorneys used their albavision.tv email addresses to provide legal advice for Telearte and other IMC subsidiaries.[39] The Attorneys also used those email addresses to provide Lynch with legal advice on personal matters.[40] At the heart of this action is whether Lynch properly acquired sixty-five percent of Belleville. At the time of the events in question, Lynch and the Attorneys worked for or represented Belleville or its subsidiaries. Lynch asserts that the Attorneys also represented him in his personal capacity in connection with his sixty-five percent acquisition, and that such representation was separate and distinct from any legal advice the Attorneys provided Lynch in his capacity as Belleville's manager or an employee of Belleville's subsidiaries.[41]

According to the Attorneys, they did not provide legal advice to Gonzalez or any other Defendants with respect to Lynch's sixty-five percent acquisition.[42] When using the albavison.tv addresses to communicate about Lynch's personal legal matters, Lynch and the Attorneys all understood that the Attorneys were acting as

---

[36] D.I. 56, Lambert Decl. ¶¶ 3–4 [hereinafter "Lambert Decl."]; D.I. 56, Landaburu Decl. ¶¶ 3–4 [hereinafter "Landaburu Decl."].

[37] Briefing on the Motion included a kerfuffle over whether the Attorneys were employed by Albavision because their respective LinkedIn profiles listed Albavision as their employer. *See* D.I. 68, 69. Both Attorneys submitted affidavits clarifying their involvement with Albavision. *See* D.I. 94, App. at A402, A405. They identified themselves as Albavision employees on their LinkedIn profiles because they "provided legal services to many entities that operate under the Albavision brand name and it was important for [their] LinkedIn profile[s] to be consistent with the role that business contacts perceived." *Id.* The profiles, therefore, reflected "how outsiders would perceive" their roles, "not [their] actual employment relationships." *Id.*

[38] *See, e.g.*, Lynch Decl. ¶ 6.

[39] *See, e.g.*, Lambert Decl. ¶¶ 1, 3–4; Landaburu Decl. ¶¶ 1, 3–4.

[40] Lynch Decl. ¶¶ 4–6; Lambert Decl. ¶¶ 3–4; Landaburu Decl. ¶¶ 3–4.

[41] Lynch Decl. ¶¶ 4–7; *see also* Lambert Decl. ¶¶ 3–6; Landaburu Decl. ¶¶ 3–6.

[42] Lambert Decl. ¶¶ 5–6; Landaburu Decl. ¶¶ 5–6.

Lynch's personal attorneys.[43]   In connection with Lynch's personal matters, the Attorneys did not believe Gonzalez or their corporate employers were their clients, even though they communicated with Lynch using their employer-provided email addresses.[44]

Lynch and the Attorneys stopped using the albavision.tv email addresses in early 2018.  Around the time Lynch executed the LLC Agreement giving him sole management authority over Belleville, Belleville migrated its employees' email from the Televideo-hosted albavision.tv email addresses to email addresses hosted on a server owned by Telearte.[45]  At that time, Plaintiffs completely abandoned use of the albavision.tv domain and server.[46]   Thus, Gonzalez, via Televideo, no longer controlled the server that hosted Belleville's and its subsidiaries' employee emails.  After the migration, Lynch could control and access emails hosted on the Telearte server.  The migration was consistent with Lynch's decision to strip Gonzalez of his co-manager status.

Lynch contends that after he decided to migrate away from the albavision.tv domain, he had a call with Sergio Vinicio Ponciano Lima, Gonzalez's IT specialist, and Fernando Banus, Telearte's Technical and Operations Manager who had worked for Albavision between October 2014 and February 2018.[47]  Lima denies that this call occurred.[48]  Lynch asserts that he "directed Lima to abstain from accessing and/or reviewing any of Lynch's emails using the email address cll@albavision.tv and also informed Lima that all emails using cll@albavision.tv were private, and that if any person accessed or reviewed the emails, it would constitute a breach of the law."[49]

---

[43] Lynch Decl. ¶¶ 5, 7; Lambert Decl.  ¶¶ 4–5; Landaburu Decl. ¶¶ 4–5.

[44] Lambert Decl.  ¶¶ 5–6; Landaburu Decl. ¶¶ 5–6.

[45] Mot. ¶ 6; Gonzalez Aff. ¶ 18.

[46] *See* D.I. 85 at 5; *see also* Mot. ¶ 6; D.I. 56, Varela Decl. ¶ 4(a) [hereinafter "Varela Decl."]; D.I. 101, Ex. B, Lima Aff. ¶ 7 [hereinafter "Second Lima Aff."].

[47] D.I. 94, App. at A398, A407–08.

[48] Second Lima Aff. ¶ 6.  I addressed the effect of the disagreement over this call on October 15.  *See* D.I. 146 at 24.

[49] D.I. 94 at 13 (citing D.I. 94, App. at A398, A408).

It is undisputed that Gonzalez searched Lynch's albavision.tv emails and potentially the emails of other Telearte employees who had previously used the albavision.tv server.[50] Gonzalez did so between February 2018 and July 11, 2019, before this litigation began.[51] Because Defendants control the albavision.tv server, Plaintiffs cannot access the albavision.tv email accounts of Lynch and the Attorneys on that server.[52]

As a result, Plaintiffs have been unable to collect or review the emails located on the albavison.tv server for purposes of this litigation.[53] As a result, on July 11, 2019, Plaintiffs asked Defendants for access to Plaintiffs' albavision.tv accounts so that Plaintiffs could meet their discovery obligations.[54] Defendants denied Plaintiffs' request.[55] The Motion followed on July 22.[56]

Plaintiffs contend that by searching and then refusing to turn over the Albavision Emails, Defendants violated Plaintiffs' attorney-client privilege under Delaware and Argentine law.[57] Plaintiffs claim that Lynch had an expectation of privacy in albavision.tv emails between himself and the Attorneys (the "Albavision Emails").[58] Plaintiffs further contend that Albavision Emails reflecting legal advice the Attorneys gave Lynch in his personal capacity are privileged.

Defendants argue that Plaintiffs did not have any expectation of privacy in emails they sent and received on Televideo's albavision.tv server, knowing that

---

[50] Mot. ¶ 8; Varela Aff. ¶ 4(b); Second Lima Aff. ¶¶ 8–9.

[51] Varela Aff. ¶ 4(b); D.I. 62 at 1 n.2.

[52] Mot. ¶ 7.

[53] *Id.*

[54] *Id.*; D.I. 85 at 4.

[55] Mot. ¶ 7.

[56] D.I. 56.

[57] Mot. ¶ 2.

[58] *Id.* ¶¶ 8, 20. When referring in this letter to emails "between Lynch and the Attorneys" or "between Lynch and Lambert or Landaburu," I intend to refer to any emails between Lynch and Lambert, Lynch and Landaburu, or any combination of the three in which counsel provided Lynch with legal advice.

Gonzalez and Televideo could access and control those emails.[59]   Defendants contend that under *In re Asia Global Crossing, Ltd.*,[60] as adopted and developed by *In re Information Management Services, Inc. Derivative Litigation*,[61] the Albavision Emails are not confidential to Lynch or the Attorneys; that, as a result, Lynch cannot assert any privilege over the Albavision Emails; and that Defendants are not required to give Lynch the Albavision Emails.[62]

The parties briefed the Motion, and on August 23, I held a telephonic conference.[63]  I asked the parties to submit supplemental memoranda analyzing the *Asia Global* factors with respect to the Albavision Emails in Gonzalez's possession, custody, and control.

Thereafter, an onslaught of discovery disputes ensued regarding the Albavision Emails and other issues.  On September 16, Defendants filed six discovery motions.[64]  That same day, Defendants filed a memorandum of law providing their analysis of the *Asia Global* factors.[65]  Also on September 16, Plaintiffs filed an omnibus discovery motion.[66]  On September 17, Defendants filed another discovery motion.[67]  On September 23, Plaintiffs filed an omnibus answering brief and *Asia Global* memorandum,[68] and Defendants filed an omnibus

---

[59] *See generally* D.I. 62, 85, 101.  Defendants refused to allow Plaintiffs to access the Albavision Emails.  In support, Defendants stated that the albavision.tv email address is "a work email, over which Mr. Lynch has no claim;" that use of a "work email" constituted waiver of any privilege between Lynch and Landaburu or Lambert; and that "Mr. Lynch abandoned this email address and the information contained therein."  D.I. 56, Ex. B (Letter dated July 15, 2019).  Defendants stated that, because of Gonzalez's control over the albavision.tv server, "[w]ell before the start of this litigation, the Defendants reviewed information contained in the albavision server."  D.I. 62 at 1 n.2.

[60] 322 B.R. 247 (Bankr. S.D.N.Y. 2005).

[61] 81 A.3d 278 (Del. Ch. 2013).

[62] *See* D.I. 85 at 8–14.

[63] D.I. 56, 62, 63, 69.

[64] D.I. 79, 80, 81, 82, 84, 86.

[65] D.I 85.

[66] D.I. 87.

[67] D.I. 88.

[68] D.I. 94.

answering brief.[69]  On September 30, Plaintiffs and Defendants filed their respective reply briefs.[70]  The parties submitted competing affidavits from Argentine attorneys, which referred and cited to various Argentine laws.[71]

On October 15, I held a telephonic conference on the various discovery motions and the parties' *Asia Global* analyses.[72]  I resolved the discovery motions and shared my thoughts on the majority of the *Asia Global* and *Information Management* analysis.  I took under advisement the question of whether Argentine law applies and, if so, whether an applicable *Information Management* statutory override exists under Argentine law.  I also requested translations of the Argentine laws the parties relied on, which Plaintiffs submitted on October 17.[73]  I granted Plaintiffs' motion in a brief letter opinion on October 18.[74]  My reasoning follows.

## II.    Analysis

Delaware Rule of Evidence 502 establishes the scope of attorney-client privilege, limiting protection to "confidential communications" between a lawyer and client for the purpose of facilitating legal services.[75]  "A communication is 'confidential' if not intended to be disclosed to third persons other than those to whom disclosure is made in furtherance of the rendition of professional legal services to the client or those reasonably necessary for the transmission of the communication."[76]  "A party's subjective expectation of confidentiality must be

---

[69] D.I. 93.

[70] D.I. 101, 102.

[71] Those affidavits are identified and discussed at length *infra*.

[72] D.I. 109, 146.

[73] D.I. 110.  Defendants also submitted translations on October 18, after I had issued my letter opinion ruling on the Motion.  D.I. 112.  The timing and substance of Defendants' submission does not affect or change my ruling on this Motion.

[74] D.I. 111.  Since that time, the parties continued to battle over the scope of discovery and Defendants' entitlement to access the Albavision Emails.  I have repeatedly informed the parties that, in accordance with my ruling on this Motion, Defendants were not permitted to access Lynch's Albavision Emails with the Attorneys regarding his ownership interest in Belleville.  *See* D.I. 121, 125.

[75] D.R.E. 502(b).

[76] *Id.* 502(a)(2).

objectively reasonable under the circumstances."[77] "The burden of proving that the privilege applies to a particular communication is on the party asserting the privilege."[78]

To resolve the Motion, I must determine whether the Albavision Emails between Lynch and the Attorneys could be confidential, where they were made using work email addresses that the authors knew could be accessed by non-employer third parties, namely Gonzalez and Televideo. If I find that the Albavision Emails are confidential communications under Rule 502, then the attorney-client privilege may attach.

Vice Chancellor Laster considered a similar issue in *Information Management*. In that case, the motion to compel asserted that because employees used their employer email accounts to communicate with counsel, the emails were no longer confidential communications under Rule 502.[79] The employer controlled and could freely access the employees' emails. Vice Chancellor Laster recognized that "Delaware courts have not addressed whether an employee has a reasonable expectation of privacy in a work email account."[80] For guidance, the Court looked to and adopted the United States Bankruptcy Court for the Southern District of New York's reasoning in *Asia Global*.[81]

*Asia Global* recognized that "under United States Supreme Court precedent, an employee can have reasonable expectation of privacy in areas such as the employee's office, desk, and files, but that the 'employee's expectation of privacy . . . may be reduced by virtue of actual office practices and procedures, or by legitimate regulation.'"[82] "Although e-mail communication, like any other form of communication, carries the risk of unauthorized disclosure, the prevailing view is

---

[77] *Info. Mgmt. Servs*, 81 A.3d at 285.

[78] *Id.* (quoting *Moyer v. Moyer,* 602 A.2d 68, 72 (Del. 1992)).

[79] *Id.*

[80] *Id.*

[81] *Id.* at 286–87.

[82] *Id.* at 286 (alteration in original) (citations omitted) (quoting *Asia Glob. Crossing*, 322 B.R. at 257).

that lawyers and clients may communicate confidential information through unencrypted e-mail with a reasonable expectation of confidentiality."[83]

> In the ordinary course of business, employees who send communications within the company over the employer's email system can reasonably expect that outsiders will not be able to access the system. Consequently, "[a]ssuming a communication is otherwise privileged, the use of the company's e-mail system does not, without more, destroy the privilege."[84]

"[W]hether the employee has a reasonable expectation of privacy must be decided on a case-by-case basis."[85] Under *Asia Global*, the Court considers four factors to determine whether an employee has a reasonable expectation of privacy, and thus confidentiality, in his work email:

> (1) does the corporation maintain a policy banning personal or other objectionable use, (2) does the company monitor the use of the employee's computer or e-mail, (3) do third parties have a right of access to the computer or e-mails, and (4) did the corporation notify the employee, or was the employee aware, of the use and monitoring policies?[86]

As explained in the October 15 teleconference, the four *Asia Global* factors suggest that the Albavision Emails are not confidential to Lynch.[87] But my inquiry does not end with the four *Asia Global* factors. In *Information Management*, Vice Chancellor Laster recognized a potential statutory override of the Court's *Asia Global* analysis.[88] If a controlling jurisdiction has a statute on the confidentiality of

---

[83] *Asia Glob. Crossing*, 322 B.R. at 257.

[84] *Info. Mgmt. Servs.*, 81 A.3d at 286 (alteration in original) (citations omitted) (quoting *Asia Glob. Crossing*, 322 B.R. at 251).

[85] *Id.* (quoting *Asia Glob. Crossing*, 322 B.R. at 257).

[86] *Id.* at 286–87 (quoting *Asia Glob. Crossing*, 322 B.R. at 257).

[87] D.I. 146 at 22–25.

[88] *Info. Mgmt. Servs.*, 81 A.3d at 292.

work emails, that statute may alter the common law results of the *Asia Global* analysis.[89]

As an initial matter, I note that I focused my *Asia Global* analysis on Televideo because Televideo controls the server hosting the Albavision Emails and is the entity that seeks to access them. In *Information Management*, the company that employed the individuals asserting privilege also controlled the email server and posed the threat of access.[90] The facts here are more complicated than a standard employee-employer relationship. The Company employees asserting privilege use work email hosted on a server owned, controlled, and reviewed by a different entity. Lynch and the Attorneys work for Telearte and other direct and indirect Belleville subsidiaries. Those entities do not control the albavision.tv server and do not present the threat to confidentiality at issue. Rather, the server is controlled by Televideo, a stranger to the employment relationship between the Company on one hand, and Lynch and the Attorneys on the other. The access that threatens the confidentiality of the Albavision Emails is not from the Company, but from Gonzalez and Televideo.

The first step in the *Information Management* statutory override analysis is to determine which sovereign may provide a statutory override.[91] *Information Management* involved a Delaware corporation conducting business in Maryland. Because the company conducted its business in Maryland, Vice Chancellor Laster looked to Maryland law and federal law, as "the federal government and the State of Maryland [were] the sovereigns whose law [the corporation] must follow when dealing with its employees' email."[92]

I apply the same reasoning here to determine which sovereign's laws govern Televideo's administration of its server.[93] Televideo has custody of the emails in

---

[89] *Id.* at 292–96.

[90] *Id.* at 284.

[91] *Id.* at 292.

[92] *Id.*

[93] The parties dispute which sovereign's laws might provide a statutory override, but focus their dispute on Belleville—not Televideo. Plaintiff asserts Argentine law applies because Belleville primarily conducts business in Argentina and because the employees using the server all reside in Argentina. *See, e.g.*, D.I. 94 at 17–19. Defendants primarily look to Delaware law because Belleville is incorporated here. For a time, Defendants asserted

question and is the entity that would have to comply with the law of its sovereigns in handling those emails. I consider the place where Televideo "conducts its business" to identify the sovereign that governs the entity's control and use of the emails.[94]

Televideo is a Florida corporation with its formal principal place of business in Florida. Televideo is part-owner of Belleville. Gonzalez and Televideo control the Albavision brand, which operates throughout Latin America. Although the parties have not clearly articulated the nature of Televideo's business, Plaintiffs refer to Televideo as a "service provider."[95] Televideo provided services for a fee to Belleville's subsidiary, including email service using the domain albavision.tv and hosting emails on that server.[96] Televideo owns and controls the Albavision server, which is physically located in Florida.[97]

By supplying an email service to a Belleville subsidiary's Argentine employees located in Argentina, Televideo had an obligation to abide by Argentine law with respect to services provided in that country. Thus, Televideo conducts its business, at least in relevant part, in Argentina. Under *Information Management*, I conclude that Argentine law must be the source of any statutory override.

The next step is to determine whether Argentine law provides a statutory override of my *Asia Global* analysis. "In cases where foreign law may be applicable, the party seeking the application of foreign law has the burden of not only raising the issue that foreign law applies, but also the burden of adequately proving the

Florida law governed Belleville's operations, but in Defendants' final brief on this issue, they abandoned reliance on Florida law and argued only that "the cited Argentine law should not apply to the question of privilege in this case and should be resolved pursuant to Delaware law given that Belleville is a Delaware corporation." D.I. 101 at 7. The parties' reliance on Belleville is misplaced. Televideo controls and can access the allegedly privileged Albavision Emails, so Televideo is the focus of my statutory override analysis. Defendants have made no argument as to whether Florida, Delaware, or Argentine law should govern Televideo's operations. Similarly, Plaintiffs do not consider Televideo when contending the laws of any specific sovereign apply on this Motion.

[94] *Info. Mgmt. Servs.*, 81 A.3d at 292.

[95] D.I. 94 at 11, 13.

[96] *Id.* at 9.

[97] D.I. 85 at 4–5.

substance of the foreign law."[98]  Plaintiffs argued, and I agree, that Argentine law governs this dispute.  Because Plaintiffs seek its application, Plaintiffs have the burden of proving the substance of any potential statutory override under Argentine law.  I look to the affidavits of the parties' Argentine legal experts, as well as the translations of the laws they cite, to determine whether Plaintiffs have met their burden of demonstrating that a statutory override exists under Argentine law.[99]  I conclude Plaintiffs have done so.

Relying on Article 18 of the Argentine Constitution, Article 1770 of the Argentine Civil and Commercial Code, and Article 153 of the Argentine Criminal Code,[100] Plaintiffs state:

> Under Argentinean law and jurisprudence, corporate emails are expected to be treated with the same degree of privacy as personal emails, unless the employee has been duly notified by the employer that the exchange of emails through the company's server could be monitored and the employee has expressly accepted such monitoring. Otherwise, it could be construed that the employee, even when using corporate emails, has a reasonable expectation of privacy.[101]

Defendants contend that "Argentina has established that there are no absolute rights" and that the "right to privacy is [] not absolute and it does recognize many basic limitations":[102]

---

[98] *Vichi v. Koninklijke Philips Elecs., N.V.*, 85 A.3d 725, 765 (Del. Ch. 2014) (quotation omitted); *see also Otto Candies, LLC v. KPMG LLP*, 2019 WL 994050, at *16 (Del. Ch. Feb. 28, 2019).

[99] *See Vichi*, 85 A.3d at 766–78; *see also Otto Candies*, 2019 WL 994050, at *24–27.

[100] Varela Decl. ¶ 6.

[101] *Id.* ¶ 5.

[102] D.I. 101, Ex. C ¶ 8 (emphasis in original) [hereinafter "Massot Aff."].

> The legal system of the Republic of Argentina recognizes the inviolability of correspondence and the right to privacy in general terms . . . and . . . there are some basic statu[t]es, such as article 1770 of the Civil and Commercial Code and article 153 of the Criminal Code that impose civil duties and/or criminal penalties to those who *arbitrarily* interfere with the private life of other people. This general principle, however, is not absolute and it is subject to a number of limitations . . . .[103]

Arguing that access "to the e-mails could be allowed for the legitimate defense of Defendants' rights,"[104] and that Argentine courts permit access into private communications, such as emails, under certain circumstances, Defendants rely on Article 326 of the Argentine Civil and Commercial Procedural Code and Article 234 of the Argentine Criminal Procedural Code.[105] Defendants also rely on Law 27.078, under which the Argentine Federal Congress declared the inviolability of emails.[106]

Under Article 18 of the Argentine Constitution, "[t]he residence may not be trespassed, nor may the written correspondence and private papers be violated."[107] Thus, the Argentine Constitution protects an individual's right of privacy in "written correspondence and private papers."[108]

Argentine laws indicate this right is expansive. Argentine Law 27.078 guarantees the inviolability of email correspondence that "induces the user to assume the privacy thereof."[109] It does so when the user would assume that the communication, such as an email, is private, and states that, in such circumstances, the communication can only be intercepted at the request of the judiciary:

---

[103] *Id.* ¶ 4 (emphasis in original).

[104] *Id.* ¶ 10.

[105] *Id.* ¶ 11.

[106] *Id.* ¶ 7.

[107] D.I. 110, Tab 1.

[108] *Id.*

[109] D.I. 110, Tab 4.

> Correspondence, understood as any communication that is made through Information Technology and Communications (ICT), including traditional postal mail, email or any other mechanism that induces the user to assume the privacy thereof and that of the traffic data associated therewith, made through telecommunications networks and services, is inviolable. Their interception, as well as their subsequent registration and analysis, will only proceed at the request of a competent judge.[110]

Law 27.078 is "applicable throughout the territory of Argentina and at places under its jurisdiction."[111]

Article 1770 of the Argentine Civil and Commercial Code, and Article 153 of the Argentine Criminal Code, further delineate the bounds of Argentina's constitutional guarantee. Article 1770 of the Argentine Civil and Commercial Code provides for "[p]rotection of private life," stating "[t]he person who *arbitrarily* meddles in the life of others . . . shares written correspondence, . . . or in any way disturbs their privacy, must be forced to cease in such activities . . . ."[112] As a corollary, Article 153 of the Argentine Criminal Code provides that one who "unduly" or "improperly" opens the communications of another will be punished.[113] Both laws prohibit others from "arbitrarily," "unduly," or "improperly" disturbing an individual's constitutional expectation of privacy in his written correspondence.

In a similar vein, Articles 326 and 234 carve out circumstances in which a third party, such as an employer, can request that the Argentine Courts or opposing party in litigation provide access to another's written correspondence, such as email. Both are procedural rules that parties or an Argentine Court may invoke during the lifetime of a case. Article 326 permits a litigant to request that a party produce documents before trial, as long as the requesting litigant is "justified" in believing production at trial would be "impossible or very difficult."[114] In criminal cases, Article 234 permits a judge to require production of correspondence, such as work

---

[110] *Id.*

[111] D.I. 110, Tab 8.

[112] D.I. 110, Tab 2 (emphasis added).

[113] D.I. 110, Tab 3.

[114] D.I. 110, Tab 6.

email: "Whenever it is considered useful for the verification of the crime, the judge may order . . . the interception and seizure of postal or telegraphic correspondence or of any other instrument sent by the defendant or addressed thereto . . . ."[115]

To rebut the broad guarantee of privacy under the Argentine Constitution, Defendants point to Law 27.078 and Articles 326 and 234, which permit "proper" or otherwise justified invasion of an individual's written correspondence in certain circumstances. But in my view, none of those exceptions cover Defendants' access to the Albavision Emails, where Lynch and the Attorneys were aware that non-employers Televideo and Gonzalez controlled the albavision.tv server; where there was no policy related to the access, use, or monitoring of emails on that server;[116] and where individuals with albavision.tv email addresses, including Lynch and the Attorneys, believed Argentine privacy protections shielded their correspondence.[117] Specifically, Law 27.078, Article 326, and Article 234 permit another to access an individual's written correspondence only when the individual voluntarily produces the correspondence during litigation or when an Argentine Court orders production. Neither circumstance is met here.

After weighing the experts' affidavits and reviewing the remainder of the submitted authority, I conclude that under Argentine law, Plaintiffs had a reasonable expectation of privacy in the Albavision Emails. Plaintiffs have demonstrated that the Argentine Constitution and other Argentine laws establish that an individual has a broad right of privacy in his written correspondence, especially when the individual would assume that the correspondence would remain private or when another's interception of the correspondence would be improper.[118] Plaintiffs have demonstrated that Argentine law would permit Defendants to access and review the

---

[115] D.I. 110, Tab 7.

[116] *See* D.I. 94, App. A396–97, A401, A404, A407.

[117] *See id.* at A397, A401, A404, A407; *see also* D.I. 102 at 13 n.7.

[118] While Plaintiffs also rely on Resolution 333/2001, I do not consider that source. Resolution 333/2001 was never enacted by the Argentine Federal Congress and "never generated legal effects." D.I. 110 at 2; Massot Aff. ¶¶ 5–6. Plaintiffs assert that the Resolution proposed a rule making emails equivalent to other types of correspondence, and that its legal import comes from subsequent common law adoptions of that rule. D.I. 110 at 2. Plaintiffs do not identify the adopting decisions or provide documents from the adopting Courts. Therefore, Plaintiffs have failed to demonstrate that the principle stated in Resolution 333/2001 governs this Motion.

Albavision Emails if doing so would not have been arbitrary, undue, or improper. At the same time, Defendants have demonstrated that, under Argentine law, the "right to privacy is [] not absolute" and "recognize[s] many basic limitations."[119] But Defendants have failed to demonstrate that their interference and intrusion into the Albavision Emails is proper, particularly under the Argentine Constitution's broad privacy guarantee.

Plaintiffs have proven that the substance of the Argentine law I must apply on this Motion provides a statutory override of my *Asia Global* analysis. Lynch and the Attorneys had rights of privacy in the Albavision Emails under Argentine law. Accordingly, the Albavision Emails are "confidential communications" under Rule 502. And so, the Albavision Emails are privileged to the extent that they contain communications between Lynch and the Attorneys (or any other attorney representing Lynch in his personal capacity) related to Lynch's personal legal matters and unrelated to his status as a Belleville co-manager. This includes all such emails stored on the albavision.tv server before Lynch migrated the emails to the Telearte server in 2018. More specifically, Defendants may not access any Albavision Emails in which Lynch sought or obtained personal legal advice regarding his acquisition of sixty-five percent of Belleville.

In the weeks since our October 15 teleconference and my October 18 letter, Defendants have continued to assert that they are entitled to Albavision Emails sent before a reasonable expectation of adversity between Lynch and Gonzalez arose in February 2018.[120] I have addressed this topic several times and in various forms, but I will again attempt to clarify my rulings.[121] I previously determined Defendants could access pre-migration emails between Lynch and counsel that are related to

---

[119] Massot Aff. ¶ 8.

[120] *See, e.g.*, D.I. 148 at 8 ("As part of the October 15 Ruling, this Court opined that there was not reasonable knowledge of adversity between Messrs. Lynch and Gonzalez, until February 2018. . . . Plaintiffs served Defendants with their Supplemental Privilege Log on October 21, 2019 . . . in which they assert that certain attorneys who were advising GBH and Messrs. Gonzalez and Lynch regarding the very transactions at issue in this case somehow were simultaneously wearing another hat in which they also represented Mr. Lynch in a personal capacity for the very same transactions. This position is inconsistent with the Court's ruling that Mr. Gonzalez had no reasonable expectation of adversity relative to Messrs. Lynch, Lambert and Landaburu until February 2018.").

[121] D.I. 146, 125, 121, 111.

Lynch's status as co-manager, based on *In re CBS Corporation Litigation*[122] and *Kalisman v. Friedman*.[123] Defendants are permitted to access and review any pre-migration Albavision Emails between Lynch and counsel, in-house or otherwise, that (1) are unrelated to Lynch's personal legal matters, such as his acquisition of sixty-five percent of Belleville; (2) are related to Lynch's role as Gonzalez's co-manager and their work for Belleville; and (3) were sent before Gonzalez had reason to believe that there was adversity between himself and Lynch or the Attorneys.

Defendants may not access pre- and post-migration emails between Lynch and counsel that related to Lynch's personal legal matters, such as his Belleville acquisition. Further, Defendants cannot access any post-migration emails that were sent after Lynch named himself Belleville's sole manager in 2018 and that are stored on the Telearte server, even to the extent those emails relate to Lynch's role as Belleville's manager. At the time Lynch and the others began using the Telearte server, Gonzalez had a reasonable expectation of adversity and did not have a reasonable expectation of shared client status, rendering post-migration emails confidential to Lynch.

## III. Conclusion

I hope this letter finalizes the privilege dispute and helps the parties efficiently conclude discovery. The Motion is resolved in Plaintiffs' favor. This issue provides no basis to postpone trial, as requested in Defendants' pending Omnibus Motion to Compel Production and for an Amendment to the Case Schedule to Allow Sufficient Time for the Completion of Discovery, filed November 5, 2019.[124] I intend to

---

[122] 2018 WL 3414163 (Del. Ch. July 13, 2018).

[123] 2013 WL 1668205 (Del. Ch. Apr. 17, 2013). On the October 15 call, I noted that *Kalisman* provides that privileged information can be withheld from one fiduciary upon sufficient existing adversity only where that director no longer has a reasonable expectation that he was client of the shared counsel. D.I. 146 at 11; *see Kalisman*, 2013 WL 1668205, at *5. I opined that "there's been no showing that Mr. Gonzalez had no reasonable expectation of a shared client status with Mr. Lynch until February of 2018" and that "[i]t is the plaintiffs' burden to show that adversity to trigger withholding documents as between the co-managers, per *CBS*." D.I. 146 at 12; *see CBS*, 2018 WL 3414163, at *5.

[124] D.I. 148.

address the remainder of Defendants' Omnibus Motion at the pre-trial conference tomorrow, November 19.

To the extent an order is required to implement this decision, **IT IS SO ORDERED**.

Sincerely,

*/s/ Morgan T. Zurn*

Vice Chancellor

MTZ/ms

cc: All Counsel of Record via *File & ServeXpress*