**COURT OF CHANCERY**
**OF THE**
**STATE OF DELAWARE**

MORGAN T. ZURN
VICE CHANCELLOR

LEONARD L. WILLIAMS JUSTICE CENTER
500 N. KING STREET, SUITE 11400
WILMINGTON, DELAWARE 19801-3734

June 1, 2020

Peter B. Ladig, Esquire
Jason C. Jowers, Esquire
Bayard, P.A.
600 North King Street, Suite 400
Wilmington, DE 19801

Tyler J. Leavengood, Esquire
Seth R. Tangman, Esquire
Potter Anderson & Corroon LLP
1313 North Market Street, 6th Floor
Wilmington, DE 19801

RE: ***DLO Enterprises, Inc. v. Innovative Chemical Products Group, LLC*,**
C.A. No. 2019-0276-MTZ

Dear Counsel:

I write regarding Counterclaim Plaintiffs' January 16, 2020, Motion for Disposition of Privilege Dispute (the "Motion").[1] In the Motion, Counterclaim Plaintiffs Innovative Chemical Products Group, LLC and ICP Construction, Inc. (collectively, "Buyers") request an order compelling Counterclaim Defendants DLO Enterprises, Inc., 301 L&D, LLC, and Daniel and Leane Owen (collectively, the "Owen Sellers," and with the entities, "Sellers") to produce unredacted copies of certain documents and an order clarifying privilege was waived over other documents in Buyers' possession. For the following reasons, the Motion is denied in part and remains under advisement in part pending supplemental briefing.

---

[1] Docket Item ("D.I.") 74.

## I.    Background

This action addresses Buyers' acquisition of substantially all of the assets of Arizona Polymer Flooring, Inc. ("Target") via an Asset Purchase and Contribution Agreement, dated January 17, 2018, by and among Buyers, Sellers, and Target (the "Purchase Agreement").[2] Buyers' operating entity for the acquired assets is Arizona Polymer Flooring, LLC ("BuyerCo"). Following the execution of the Purchase Agreement, Target was renamed DLO Enterprises, Inc. ("DLO").

The year before the Purchase Agreement, Target developed and sold a certain line of adhesive products that accounted for approximately $1.8 million in sales, but suffered from defects.[3] The parties dispute who bears the financial responsibility for defective products that were sold pre-Purchase Agreement, but that were returned post-Purchase Agreement. Buyers assert Sellers knew of the products' problems and knowingly misrepresented that Target's financial statements contained no undisclosed liabilities and that the products met certain quality and workmanship standards.[4]

---

[2] *Id.*, Ex. A [hereinafter "Purchase Agreement"].

[3] *Id.*, Ex. B.

[4] Purchase Agreement §§ 3.4(c), 3.17.

Sellers filed a Verified Complaint on April 10, 2019, and Buyers filed an Answer and Verified Counterclaims on May 6. Buyers issued their First Set of Requests for Production of Documents to Sellers on July 25 (the "Requests").[5] A dispute arose regarding the privilege associated with various documents responsive to the Requests, as well as emails between the Owen Sellers and counsel on email accounts Buyers acquired through the asset purchase. The parties met and conferred multiple times regarding the privilege issues, but were unable to resolve them.[6] The Motion followed. The parties fully briefed the Motion by February 14. On February 27, I heard argument and took the matter under advisement.

Buyers seek to compel the production of two categories of responsive privileged documents:

> (1) Documents reflecting communications between the [Sellers] and their former attorneys at Boyer Bohn, P.C., who represented them in the Acquisition, which the [Sellers] have collected and produced in redacted form based on assertions of privilege in this litigation (the "Category One Documents");
>
> (2) Documents reflecting communications between the [Sellers] and Boyer Bohn, P.C., which [Buyers are] currently in possession of because these documents were left in [Buyers'] email accounts (the "Category Two Documents").[7]

---

[5] D.I. 74, Ex. N.

[6] *Id.*, Ex. O–P.

[7] *Id.* ¶ 9.

The Category One Documents are a subset of Sellers' pre-closing deal communications that Sellers produced to Buyers in this litigation. Sellers produced the Category One Documents in response to the Requests relating "to the sale of the assets and the negotiation of the asset purchase agreement."[8] They did so in redacted form based on attorney-client privilege, and now seek to protect those redacted portions as privileged. Buyers seek unredacted versions of the Category One Documents, contending that Sellers' pre-closing privilege passed to Buyers by operation of Delaware law, and that Buyers also purchased the right to waive privilege over Sellers' deal negotiations via the Purchase Agreement. Buyers do not

---

[8] D.I. 112 at 10. Buyers have varied which documents they seek to compel as Category One Documents, at times focusing more heavily on documents relating to Assets and Inventory (as defined in the Purchase Agreement and addressed below) than negotiation of the Purchase Agreement itself. *Compare* D.I. 74 ¶ 12 ("The majority of these documents likely concern the sale of APF's Assets to ICP, including the defective 'Inventory.'"), *and* D.I. 112 at 11 ("But they produced [the Category One Documents] in redacted fashion so that we can see the other side. We're not sure how many have been withheld entirely on the basis of privilege because we haven't produced our privilege logs. But any communications related to the negotiation of the APA is what we're seeking in the Category 1 documents."), *with* D.I. 74 at ¶ 9 (defining Category One Documents as documents "produced in redacted form"), *and* D.I. 74 at 15 ("Based on the foregoing, ICP respectfully requests an Order compelling the [Owen Sellers] to produce unredacted copies of Category One Documents . . . ."), *and* D.I. 91 at 9 (same). At argument, Buyers confirmed they only seek to compel deal communications about the asset sale that were produced in redacted form in response to the Requests. D.I. 112 at 6–7, 10 ("I think the order could just say anything that is related to the sale of the assets and the negotiation of the asset purchase agreement should be produced."). I take this as the most accurate representation of the Category One Documents Buyers seek.

contend that Category One Documents remained on the email accounts that were transferred to Buyers under the Purchase Agreement.

The Category Two Documents consist of 48 pre-closing communications and 28 post-closing communications between the Owen Sellers and their counsel on email accounts transferred to Buyers in the transaction.[9] Post-closing, Daniel Owen continued to use his Buyers email account to communicate with attorneys; accordingly, those emails have always been in Buyers' possession.[10] Sellers seek to protect the Category Two Documents as privileged. Buyers contend Sellers waived any privilege over the Category Two Documents when they transferred Target's email accounts containing pre-close emails to Buyers, and when the Owen Sellers continued to use them to communicate with counsel post-close. In support, Buyers contend the Owen Sellers did not have an expectation of privacy when they used the email, both before and after the transfer.

Thus, Buyers seek the two categories under two different privilege waiver doctrines. I first consider whether the right to waive privilege over the Category One Documents passed to Buyers by law or contract. Then I consider whether Sellers waived privilege over the Category Two Documents.

---

[9] *See* D.I. 100.

[10] D.I. 74 ¶ 24.

## II.    Analysis

Delaware has long recognized that the attorney-client privilege "protects the communications between a client and an attorney acting in his professional capacity where the communications are intended to be confidential, and the confidentiality is not waived."[11]  Delaware Rule of Evidence 502 limits the attorney-client privilege to "confidential communications" between a lawyer and client for the purposes of facilitating legal services.[12]    The attorney-client privilege "extends to a (1) communication, (2) which is confidential, (3) which was for the purpose of facilitating the rendition of professional legal services to the client, (4) between the client and his attorney."[13]  "The burden of establishing that otherwise discoverable information is privileged rests 'on the party asserting the privilege.'"[14]  Sellers claim attorney-client privilege over both categories of documents.

---

[11] *Moyer v. Moyer*, 602 A.2d 68, 72 (Del. 1992).

[12] D.R.E. 502(b).

[13] *Moyer*, 602 A.2d at 72 (quoting *Ramada Inns, Inc. v. Dow Jones & Co., Inc.*, 523 A.2d 968, 970 (Del. Super. 1986)).

[14] *In re Oxbow Carbon LLC Unitholder Litig.*, 2017 WL 959396, at *4 (Del. Ch. Mar. 13, 2017).

### A. Category One Documents

With respect to the Category One Documents, the parties dispute whether in the Purchase Agreement or by operation of law, Buyers purchased the right to waive Sellers' privilege over pre-close deal communications. To address this issue, both parties looked to common law addressing privilege in a merger.[15] In *Great Hill Equity Partners IV, LP v. SIG Growth Equity Fund I, LLLP*, then-Chancellor Strine established a baseline rule for attorney-client privilege in the merger context.[16] *Great Hill* addressed an issue of first impression: whether Section 259 of the DGCL (which provides that following a merger, "all property, rights, privileges, powers and franchises, and all and every other interest shall be thereafter as effectually the property of the surviving or resulting corporation") includes attorney-client privilege and communications regarding merger negotiations.[17]

The Court determined that absent "an express carve out, the privilege over all pre-merger communications—including those relating to the negotiation of the

---

[15] Buyers also argue that under the "practical consequences test," as outlined in *Soverain Software LLC v. Gap, Inc.*, 340 F. Supp. 2d 760, 763 (E.D. Tex. 2004), privilege transferred to the Buyers under the Purchase Agreement. D.I. 74 ¶¶ 21–22. Neither party identified a Delaware case, applying Delaware law, that adopted the practical consequences test. I decline to do so today.

[16] *Great Hill Equity P'rs IV, LP v. SIG Growth Equity Fund I, LLLP*, 80 A.3d 155 (Del. Ch. 2013).

[17] *Id.* at 156 (quoting 8 *Del. C.* § 259).

merger itself—passed to the surviving corporation in the merger, by plain operation of clear Delaware statutory law under § 259 of the DGCL."[18] "[T]he answer to any parties worried about facing this predicament in the future is to use their contractual freedom in the manner shown in prior deals to exclude from the transferred assets the attorney-client communications they wish to retain as their own."[19] In *Great Hill*, "the Seller did not carve out from the assets transferred to the surviving corporation any pre-merger attorney-client communications," and the Court determined it would "not unilaterally read such a carve out into the parties' contract."[20]

Vice Chancellor McCormick recently reinforced this principle in *Shareholder Representative Services LLC v. RSI Holdco* ("*RSI Holdco II*"). She determined the sellers in a merger heeded *Great Hill*'s advice and successfully "used their contractual freedom to secure a provision in the merger agreement, which preserved their ability to assert privilege over pre-merger attorney-client communications."[21] *RSI Holdco II* illustrates the importance of explicitly and clearly contracting for the

---

[18] *Id.* at 162.

[19] *Id.* at 161.

[20] *Id.* at 161–62.

[21] *S'holder Representative Servs. LLC v. RSI Holdco*, 2019 WL 2290916, at *1 (Del. Ch. May 29, 2019).

treatment of pre-closing privileged communications that would otherwise be transferred to a purchaser via merger under Section 259 and *Great Hill*.

But Section 259 and *Great Hill*'s interpretation of it do not apply here, as this case centers on an asset purchase, not a merger. Then-Chancellor Strine acknowledged as much in *Great Hill* when distinguishing *Postorivo v. AG Paintball Holdings, Inc.*, an asset purchase case in which the Court applied

> New York law to an asset purchase agreement that excluded certain assets, rather than a merger that included all assets, and the parties had agreed that under the specific contractual terms of their transaction, the seller retained the attorney-client privilege over communications relating to the negotiation of the transaction . . . . *Postorivo* did not even cite § 259 of the DGCL.[22]

He also characterized *Great Hill*'s question presented as "an issue of statutory interpretation in the first instance."[23] Mergers governed by statute, which

---

[22] *Great Hill*, 80 A.3d at 158–59 (distinguishing *Postorivo v. AG Paintball Hldgs., Inc.*, 2008 WL 343856 (Del. Ch. Feb. 7, 2008)).

[23] *Id.* at 156. Buyers argue the application of *Great Hill* is not limited to mergers because the case upon which then-Chancellor Strine relied, *Commodity Futures Trading Comm'n v. Weintraub*, 471 U.S. 343 (1985), did not involve a merger. D.I. 91 at 6–7. Although *Weintraub* involved bankruptcy and a debtor's trustee, a fuller review of *Weintraub* undermines Buyers' argument. In briefing, Buyers excerpt certain language from *Weintraub* in support of their position. The full text surrounding Buyers' excerpt states:

automatically transfer "all property, rights, privileges, powers and franchises,"[24] are distinct from asset purchase transactions governed by agreements, which enumerate the assets being sold. In this case, we must look to the Purchase Agreement, not a statute, to determine if Buyers purchased certain assets and privileges.

In addition to their different sources of governance, mergers and asset purchases present practical differences. Unlike a merger, in an asset purchase transaction, the selling entity is not extinguished by or subsumed within the purchasing entity.[25] The seller still exists, holding any assets that were not purchased, together with related privileges.

---

> The parties also agree that when control of a corporation passes to new management, the authority to assert and waive the corporation's attorney-client privilege passes as well. New managers installed as a result of a takeover, merger, loss of confidence by shareholders, or simply normal succession, may waive the attorney-client privilege with respect to communications made by former officers and directors. Displaced managers may not assert the privilege over the wishes of current managers, even as to statements that the former might have made to counsel concerning matters within the scope of their corporate duties.

*Weintraub*, 471 U.S. at 349. Unlike the *Weintraub* transaction and the *Great Hill* merger, an asset purchase, by its nature, preserves the target as an independent entity. The asset purchase underlying this case, which transferred assets from one entity to another, is distinct from the changes of management or control of the same corporation discussed in *Weintraub* and *Great Hill*.

[24] 8 *Del. C.* § 259.

[25] *See* 8 *Del. C.* § 259(a) ("When any merger or consolidation shall have become effective under this chapter, for all purposes of the laws of this State the separate existence of all the constituent corporations, or of all such constituent corporations except the one into which the other or others of such constituent corporations have been merged, as the case may be,

> [I]t makes more sense for [Sellers] to hold the attorney-client privilege for the discrete and segregable assets and liabilities explicitly reserved for them under the APA. Imagine the impracticality of a contrary result: [Sellers] would have to prosecute . . . and defend an excluded liability without the ability to assert or waive the attorney-client privilege for communications related to those matters. Instead, [Buyers] would be the only entit[ies] with that authority, and it foreseeably could have interests adverse to [Sellers].[26]

In keeping with this reasoning, the parties here concede this litigation is an Excluded Liability under the Purchase Agreement; therefore, the privilege for this litigation remains with Sellers.[27]

In addition, as recognized in *Postorivo*, the parties to an asset purchase are in an adversarial relationship.[28] The target company has independent rights that are adverse to the buyer's rights.[29] If an asset purchase breaks down, the parties to the agreement will be forced to litigate. In view of that very real risk, *Postorivo* suggests, and I believe, that the default permits each party to retain the privilege attached to its position in the asset purchase relationship. Indeed, here, DLO

---

shall cease and the constituent corporations shall become a new corporation, or be merged into 1 of such corporations, as the case may be . . . .").

[26] *Postorivo*, 2008 WL 343856, at *8. While *Postorivo* applied a New York standard that does not govern here, its observations are astute and applicable.

[27] D.I. 112 at 6–7.

[28] *Postorivo*, 2008 WL 343856, at *6.

[29] *Id.*

continues to exist, with fewer assets than it held prior to the APA when it was known as Arizona Polymer Flooring, Inc. And, in fact, DLO is litigating against Buyers regarding the negotiation of the APA. Privilege regarding an asset purchase agreement and associated negotiations does not pass to the purchaser by the default operation of any law, but rather, remains with the seller unless the buyer contracts for something different.

While Section 259's default as explained in *Great Hill* and *RSI Holdco II* does not apply in the asset purchase context, another lesson from those cases does: parties must explicitly bargain for a deviation from the baseline rule governing pre-closing privilege. In the asset purchase context, the seller will retain pre-closing privilege regarding the agreement and negotiations unless the buyer clearly bargains for waiver or a waiver right. Here, Buyers failed to explicitly secure pre-closing privilege waiver rights relating to the negotiation of the Purchase Agreement. Where Buyers did not clearly secure in the Purchase Agreement itself the rights they seek this Court to enforce, the Court will not unilaterally read such rights into existence.[30] Accordingly, Sellers retain privilege with respect to such communications.

---

[30] *See id.* ("Moreover, no provision of the APA provides that [Sellers] sold or transferred their respective privileges and rights concerning communications with counsel related to the APA or the negotiations associated with the Agreement.").

In fact, the Purchase Agreement provides that Buyers did not obtain the right to waive privilege over Sellers' deal communications. Section 8.9 of the Purchase Agreement gives Buyers waiver rights over the privilege relating to Assets and Assumed Liabilities transferred to Buyers. It provides, "The parties intend that, at all times after the Closing, [Buyer] will have the right in its discretion to assert or waive any attorney work-product protections, attorney-client privileges and similar protections and privileges relating to the Assets and Assumed Liabilities."[31] The question presented by the Motion is therefore whether deal communications relate to Assets and Assumed Liabilities.

---

[31] On November 13, 2017, Buyers' counsel sent Sellers' counsel an initial draft of the Purchase Agreement containing Section 8.9. D.I. 74, Ex. Q. Sellers' counsel returned a redlined copy of the Purchase Agreement striking Section 8.9. *Id.*, Ex. R. Buyers then reinserted Section 8.9. *Id.*, Ex. S. Thereafter, Section 8.9 remained in the additional drafts the Parties exchanged and was included in the final executed version. Buyers argue that Section 8.9 constitutes an intentional privilege waiver under Delaware Rule of Evidence 510(a). D.I. 74 ¶ 17. Rule 510(a) provides, "[a] person waives a privilege conferred by these rules or work-product protection if such person or such person's predecessor while holder of the privilege or while entitled to work-product protection intentionally discloses or consents to disclosure of any significant part of the privileged or protected communication or information." D.R.E. 510(a). I do not find that Section 8.9 constituted a consent to disclosure of any significant part of the privileged communications at issue in this action. As explained below, Section 8.9 is not a waiver as contemplated under Rule 510(a) for the pre-closing deal communications.

Section 1.1 defines Assets:

> Sellers will sell, convey, assign, transfer and deliver to Purchaser, and Purchaser will purchase and acquire from Sellers free and clear of any Liens, all of Sellers' right, title and interest in all of the properties and assets of Sellers, ***excluding only the Excluded Assets*** and the Contributed Assets . . . .[32]

Section 1.2 defines Excluded Assets "[n]otwithstanding the foregoing Section 1.1" to include "the [Sellers'] rights under or pursuant to this Agreement and agreements entered into pursuant to this Agreement."[33]

Section 1.1 goes on to enumerate Assets. Section 1.1(c) includes "all files . . . including without limitation quotation and purchase records and all books, records, ledgers, files, document, correspondence, lists, studies, and reports and other printed or written materials with respect to the Assets and Business."[34] Section 1.1(d) includes "all inventory, wherever located, including all raw materials, spare parts and all other materials and supplies to be used in the production, service and repair of goods by the Company including without limitation the inventory set forth on Schedule 1.1(d) (the "Inventory")."[35]

---

[32] Purchase Agreement § 1.1 (emphasis added).

[33] *Id.* § 1.2(b).

[34] *Id.* § 1.1(c).

[35] *Id.* § 1.1(d).

Buyers stretch the provisions of the Purchase Agreement to argue they acquired the right to waive privilege over Sellers' deal communications. Buyers try to include deal communications under Section 8.9's privilege waiver by asserting those communications are Assets enumerated in Sections 1.1(c) and (d). Buyers argue that the defective product line falls under the definition of Inventory and is therefore an Asset; speculate that the majority of deal communications likely concern the sale of Assets; point out that they acquired all pre-closing communications "with respect to Assets" under Section 1.1(c); and contend the Owen Sellers' privileges are not among the Excluded Assets.[36]

But Buyers have failed to identify a clear contractual right to the privilege over deal communications.[37] Section 8.9's privilege waiver for Assets does not reach deal communications because Sellers' rights under or pursuant to the Purchase Agreement were carved out as an Excluded Asset under Section 1.2.[38] Under that Section, Excluded Assets include Sellers' "rights under or pursuant to this

---

[36] D.I. 74 ¶ 12; D.I. 91 at 4.

[37] Therefore, Buyers must demonstrate the privilege over deal communications relates to an Asset. At argument, when pressed, Buyers did not pursue the theory that "Inventory" included sold products. D.I. 112 at 19–20. Buyers have offered no other means to categorize communications about the defective products or the purchase agreement as Assets.

[38] *See* Purchase Agreement §§ 1.1, 1.2.

Agreement." In *Postorivo*, this Court concluded that where "Excluded Assets" included "[a]ll rights of the Sellers under this Agreement and all agreements and other documentation relating to the transactions contemplated hereby," the sellers retained privilege over communications related to the asset purchase agreement negotiations.[39] Because Sellers' rights under the Purchase Agreement are an Excluded Asset, Buyers did not purchase documentation or privileges relating to those rights. Under the language of the Purchase Agreement as informed by *Postorivo*, Buyers did not contract for the right to assert a privilege waiver over Sellers' deal communications.[40] The pre-closing privilege over deal communications pertains to an Excluded Asset and therefore stays with Sellers.

The Motion is denied as to the Category One Documents.

*B. Category Two Documents*

The Category Two Documents consist of 48 pre-closing documents and 28 post-closing documents.[41] These are emails between the Owen Sellers and their attorneys on email accounts transferred to Buyers as part of the acquisition, and so

---

[39] *Postorivo*, 2008 WL 343856, at *6, n.25.

[40] In 2008, Vice Chancellor Parsons stated in *Postorivo*, "I am mindful that the parties cited, and my own research revealed, very little case law directly addressing the issue presented here." 2008 WL 343856, at *8. In this area, at least, not much has changed since 2008: *Postorivo* still appears to be the only case taking up these issues.

[41] *See* D.I. 100.

are currently in Buyers' possession.  Buyers argue that by allowing the emails to fall into Buyers' hands, the Sellers waived any attorney-client privilege over these documents.[42]

The parties focus on the confidentiality of the Category Two Documents. They ask me to evaluate that confidentiality by applying *In re Information Management Services, Inc. Derivative Litigation*, which addressed confidentiality through the lens of an employee's reasonable expectation of privacy in her work email.[43]  In that case, "[f]or guidance, the Court looked to and adopted the United States Bankruptcy Court for the Southern District of New York's reasoning in [*In re Asia Global Crossing, Ltd.*]."[44]

I believe *Asia Global* is the appropriate test for the 28 post-closing communications with Daniel Owen while he was Vice President of BuyerCo.[45]  It is less clear to me that this is the proper test for the confidentiality of the 48 pre-closing communications as against Buyers, which were written when Buyers did not have access to Target's computers or Target's employees' email accounts.  I will start by

---

[42] As with the Category One Documents, Buyers did not acquire the privilege associated with the Category Two Documents under the Purchase Agreement or by operation of law.

[43] *In re Info. Mgmt. Servs., Inc. Deriv. Litig.*, 81 A.3d 278 (Del. Ch. 2013).

[44] *Lynch v. Gonzalez*, 2019 WL 6125223, at *5 (Del. Ch. Nov. 18, 2019).

[45] D.I. 1 ¶ 29.

addressing the post-closing communications under *Asia Global* and then turn to the pre-closing communications.

"Although e-mail communication, like any other form of communication, carries the risk of unauthorized disclosure, the prevailing view is that lawyers and clients may communicate confidential information through unencrypted e-mail with a reasonable expectation of confidentiality."[46] Four factors inform whether an employee has a reasonable expectation of privacy, and thus confidentiality, in her work email:

> (1) does the corporation maintain a policy banning personal or other objectionable use, (2) does the company monitor the use of the employee's computer or e-mail, (3) do third parties have a right of access to the computer or e-mails, and (4) did the corporation notify the employee, or was the employee aware, of the use and monitoring policies?[47]

The first *Asia Global* factor focuses "on the nature and specificity of the employer's policies regarding email use and monitoring" and weighs in favor of production "when the employer has a clear policy banning or restricting personal use, where the employer informs employees that they have no right of personal privacy in work email communications, or where the employer advises employees

---

[46] *In re Asia Glob. Crossing, Ltd.,* 322 B.R. 247, 257 (Bankr. S.D.N.Y. Mar. 21, 2005).

[47] *Id.*

that the employer monitors or reserves the right to monitor work email communications."[48] "[A]n outright ban on personal use would likely end the privilege inquiry at the start,"[49] but a complete ban is not required.

BuyerCo did not place an outright ban on personal use. But when the post-closing communications were made, Buyers' employee handbook (the "Buyers Handbook") established that employees did not have an expectation of privacy and, importantly, that the company reserved the right to access employees' email accounts at any time.[50] The first factor favors production of post-closing Category Two Documents created at BuyerCo.

---

[48] *Info. Mgmt.*, 81 A.3d at 288.

[49] *Id.* at 278–88 (quoting *United States v. Finazzo*, 2013 WL 619572, at *8 (E.D.N.Y. Feb. 19, 2013)).

[50] Buyers look to the ICP Employee Handbook effective January 1, 2017 to govern the Owen Sellers' expectation of privacy for post-close communication, and Sellers do not dispute this is the proper governing document. D.I. 74 ¶ 25; D.I. 85 at 13–14. The Buyers Handbook "is provided as a guide to the employment policies, practices and benefits of the ICP Group LLC and all affiliated entities – ICP Construction, Inc., ICP Industrial, Inc., and ICP Adhesives & Sealants, Inc." D.I. 78, Ex. W at ICP009805_0004. Buyers Handbook provides:

> The Company's Electronic Resources and the information, files and data transmitted by, accessed, received, or stored on them are not private or confidential and employees and other individuals have no expectation of privacy in their use. The Company reserves the right to, and in fact does, inspect, monitor, track, review, retain disclose . . . all documents, email and other electronic communications . . . .

*Id.* at ICP009805_0012.

The second factor focuses "on the extent to which the employer adheres to or enforces its policies and the employee's knowledge of or reliance on deviations from the policy."[51]

> If an employer has clearly and explicitly reserved the right to monitor work email, then the absence of past monitoring or a practice of intermittent or as-needed monitoring comports with the policy and does not undermine it. In that setting, "evidence of actual monitoring would make an expectation of privacy even less reasonable."[52]

Although the Buyers Handbook includes monitoring provisions, Buyers have not shown that BuyerCo actually engaged in email monitoring. As such, I treat the second factor as neutral for the post-closing Category Two Documents.[53]

In a work email case, the third factor, which asks whether "third parties have a right of access to the computer or e-mails," is largely duplicative of the first and second factors.[54] "[B]y definition the employer has the technical ability to access the employee's work email account."[55] "The third factor is most helpful when analyzing webmail or other electronic files that the employer has been able to

---

[51] *Info. Mgmt.*, 81 A.3d at 289.

[52] *Id.* at 289–90 (quoting *United States v. Finazzo,* 2013 WL 619572, at *7 (E.D.N.Y. Feb. 19, 2013)).

[53] *Id.* at 290 ("[B]ecause IMS never actually engaged in email monitoring, I treat the factor as neutral.").

[54] *Asia Glob.,* 322 B.R. at 257.

[55] *Info. Mgmt.*, 81 A.3d at 290.

intercept, recover, or otherwise obtain," and considers what the employer had to do to obtain electronic files, "such as whether the employer used forensic recovery techniques, deployed special monitoring software, or hacked the employee's accounts or files" due to password-protection, encryption, or deletion.[56] Here, for the post-closing communications created at BuyerCo, this is a straightforward work email case: Daniel Owen was employed by BuyerCo post-closing. The third factor, like the first, favors production of the post-closing documents.

The final factor, regarding an employee's knowledge of the use and monitoring policies, favors the existence of a reasonable expectation of privacy if the employee lacked knowledge of the policies. "If the employee had actual or constructive knowledge of the policy, then this factor favors production because any subjective expectation of privacy that the employee may have had is likely unreasonable."[57] Importantly, "[d]ecisions have readily imputed knowledge of an employer's policy to officers and senior employees."[58]

---

[56] *Id.* at 290–91.

[57] *Id.* at 291–92.

[58] *Id.* at 292.

The Owen Sellers argue they were never provided the Buyers Handbook and were never made aware BuyerCo could monitor their emails.[59]  This argument is refuted by the fact that at the bottom of numerous emails the Owen Sellers sent, BuyerCo applied a disclaimer stating that "messages sent to and from employees in our organization may be monitored."[60]  The fourth factor therefore favors production as to the post-closing Category Two Documents.

For post-closing Category Two Documents, three of the four *Asia Global* factors point towards production and one is neutral.  But my inquiry does not end here.  In *Information Management*, the Court recognized a potential statutory override of the *Asia Global* analysis.  "If a controlling jurisdiction has a statute on the confidentiality of work emails, that statute may alter the common law results of the *Asia Global* analysis."[61]  The parties have failed to brief this portion of the analysis.  To complete my analysis, I request the parties submit supplemental briefing on a potential statutory override.[62]  The Motion remains under advisement

---

[59] D.I. 86 ¶¶ 5–8.

[60] D.I. 91, Ex. Y.

[61] *Lynch*, 2019 WL 6125223, at *6.

[62] Such supplemental briefing is only necessary if the parties continue to spar over the 28 post-closing communications.  At argument, Sellers' counsel explained that he believed the post-close emails in Category Two are ". . . going to be cleanup from the transaction. So I'm not sure . . . there's going to be, really, a whole lot that we would fight about on

as to the post-closing Category Two Documents pending supplemental briefing or a stipulation.

As to the pre-closing communications in Buyers' possession, *Postorivo* indicates that the proper test may be one of inadvertent production, rather than solely a consideration of the employees' expectation of privacy when working for Target.[63] It seems to me that the proper analysis may not focus exclusively on the Owen Sellers' expectation of privacy in their email accounts while employed by Target,

---

that issue . . . the bulk . . . would be just ministerial and implementation effects of the asset purchase agreement." D.I. 112 at 41–42.

[63] *Postorivo*, 2008 WL 343856, at *4, n.13 (citing D.R.E. 510) ("Defendants do argue, however, that to the extent any such privileged communications and documents continue to reside on KEE Action computers and servers, Plaintiffs have waived the privilege. As I stated at argument, there has been no waiver of privilege here. Specifically, the circumstances do not support a reasonable inference that Plaintiffs deliberately and voluntarily relinquish the right to assert their claims of privilege by virtue of the way Campo and others conducted their affairs after the APA closed."); Russell C. Silberglied, *Who Owns Privileged E-Mails in a §363 Sale Case? Is Ownership Waived When the Debtor's Computer Servers Are Sold?*, 28-FEB Am. Bankr. Inst. J. 46 ("In a footnote, the court [in *Postorivo*] rejected an argument that the sellers waived all privilege that the sellers retained because the documents were actually in the buyer's possession on the transferred computer server. Using language suggestive of the 'inadvertent production' standard for producing paper documents in litigation, the court held that no 'reasonable inference' could be drawn that [the Sellers] 'deliberately and voluntarily' surrendered attorney-client privilege."); *see also In re Hechinger Inv. Co. of Del.*, 285 B.R. 601, 615 (D. Del. 2002) ("Under this scenario [where a liquidating trust that controlled privilege, following debtor's bankruptcy filing, waited several months after adversity arose to assert privilege over communications between corporate counsel and the debtor's officers and directors], clearly plaintiff's efforts to preserve any privilege have been inadequate, and any privilege has been waived.").

but may also address whether Sellers deliberately and voluntarily relinquished the right to assert their claim of privilege when they transferred the email accounts to Buyers. The terms of the Purchase Agreement may also be informative here.

It also seems that the proper analysis should consider who holds the privilege over the communications. The *Asia Global* inquiry focuses on an individual employee's privilege to the exclusion of her employer, which may be compromised by the employer's access to the employee's communications. Here, Sellers may hold the privilege over the Owen Sellers' emails, such that Target's access to the Owen Sellers' emails would not destroy any relevant confidentiality.

To complete my analysis, I request supplemental briefing on the proper test to assess whether Sellers waived privilege of the pre-closing deal communications that remain on email accounts transferred to Buyers under the Purchase Agreement. The Motion remains under advisement as to the pre-closing Category Two Documents pending supplemental briefing or a stipulation.

As a final note, I cannot ignore Buyers' counsel's inappropriate review of the content of the potentially privileged Category Two Documents in their possession. Upon realizing Buyers possessed potentially privileged documents, counsel should have abstained from reviewing their content, and instead segregated the documents, perhaps by using metadata, pending resolution of the privilege dispute. Counsel

should not have viewed these documents prior to resolving the privilege issues associated with them. Upon resolution of the Motion, Sellers may file a letter outlining the relief they deem appropriate to rectify this wrong as it relates to the Category Two Documents if they, or any subset thereof, are found to be privileged.

### III. Conclusion

The Motion is denied as to the Category One Documents. The Motion remains under advisement as to (i) the pre-closing Category Two Documents pending supplemental briefing on the proper test to assess the privilege of these communications and (ii) the post-closing Category Two Documents pending supplemental briefing on a potential statutory override of the *Asia Global* analysis.

To the extent an order is required to implement this decision, **IT IS SO ORDERED**.

Sincerely,

*/s/ Morgan T. Zurn*

Vice Chancellor

MTZ/ms

cc: All Counsel of Record, via *File & ServeXpress*